IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONY HOONG,<br><br>               Petitioner,<br><br>       vs.<br><br>RAUL LOPEZ, Warden, California State<br>Prison, Corcoran,<br><br>           Respondent. | No. 2:10-cv-01247-JKS<br><br>MEMORANDUM DECISION |

Tony Hoong, a state prisoner appearing through counsel, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Hoong is in the custody of the California department of Corrections and Rehabilitation, incarcerated at the California State Prison, Corcoran. Respondent has answered, and Hoong as replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

A Sacramento County Superior Court jury found Hoong, together with a co-defendant (Bobby Chiu), guilty of first-degree murder (Cal. Penal Code § 187). The jury also found true enhancement allegations that the defendants had committed the crime in association with a criminal gang (Cal. Penal Code § 186.22(b)), and a principal's use of a firearm in the crime, resulting in great bodily injury (Cal. Penal Code § 12022.53(d), (e)). On July 29, 2005, the trial court sentenced Hoong to an indeterminate prison term of fifty years to life. On appeal, the California Court of Appeal, Third Appellate District, affirmed the murder conviction, but vacated Hoong's enhancements and remanded with directions to dismiss the firearm enhancement and

allow the People to re-allege the gang enhancement.[1]  The California Supreme Court denied review on February 25, 2009.  On May 20, 2010, Hoong filed a petition for habeas relief in the California Supreme Court, which was summarily denied without opinion or citation to authority on June 8, 2011.  Hoong timely filed his Petition for relief in this Court on May 21, 2010.

The California Court of Appeal summarized the appeal and the facts underlying the convictions:

> Neither defendant was the actual shooter of the victim. The prosecution advanced alternative theories of derivative liability under which at least defendant Chiu encouraged an intended premeditated murder, or both participated in intended misdemeanors (simple assault or fighting in public) with the consequential offense of murder.  As a result, they make lengthy arguments regarding the absence of more extensive instructions on defense of self or others (as either complete justification or mitigation), and the propriety of permitting accomplice liability for the murder conviction or the gun enhancement if the intended offenses were only misdemeanors. They also challenge (in divergent ways) the sufficiency of the evidence to support the murder verdict.  They contend that the admission of hearsay evidence to prove the gang enhancement violated their right of confrontation; that the evidence was insufficient to support the gang enhancement; and (as to defendant Hoong) that the trial court abused its discretion in allowing the use of superfluous proof of the necessary predicate crimes for that enhancement.  They criticize the trial court's use of the instruction on the role of motive.  Finally, they attempt to assign prosecutorial misconduct for the first time on appeal.
>
> Under compulsion of the far-reaching duty that our Supreme Court has fashioned to instruct on lesser offenses sua sponte, we must reverse the murder conviction of defendant Chiu and vacate the related enhancements.  We also find the evidence is insufficient to support either enhancement as to defendant Hoong.  We otherwise affirm the judgment as to defendant Hoong.
>
> ### FACTS
>
> On the night before the fatal shooting, Macson was involved in an exchange of instant messages on his computer with Sarn.  The former was Laotian and bore the indicia of a gang of Laotian nationality, but claimed these were simply a matter of ethnic pride (and no one else suggested that he had any affiliation with any gang). The latter was Mien, and was associated with a group of fellow nationals who claimed Crip affiliation.  The dispute between them, however, did not have any basis

---

[1] *People v. Chiu*, No. C050441, 2008 WL 4868626 (Cal. Ct. App. Nov. 12, 2008).  The court also reversed Chiu's conviction.

2

in gang rivalry. Rather, each of the boys was allied with opposite sides in a dispute between two girls. Sarn challenged Macson to meet on the next day at an Internet café near their high school for a fight. Sarn asserted that he would show up with a gun and gang cohorts. Sarn threatened to shoot Macson if he failed to show up, and to shoot Macson's father if he intervened. (Macson's father owned the pizzeria next to the Internet café.) Macson told Sarn that even though he came from a good neighborhood, he could get some friends to support him in a fight as well.

Even though Macson (who had known Sarn for a few years and had been friends with him up to this point) thought Sarn was all bluff, he was somewhat concerned. He phoned two of his friends, one of whom was Simon. He relayed the threats from Sarn, seeking Simon's help and advice. At trial, he was initially somewhat equivocal about the assistance he sought from Simon, but he eventually acknowledged that he wanted Simon to be there in case the fight turned out to be more than just mano-a-mano. Simon was vague about whether he would be there.

Macson spoke with a number of people about the possibly impending fight. After school let out, he walked over to the nearby intersection at which the Internet café and pizzeria were located, an area frequented with all sorts of teenagers. On this afternoon, however, there were an unusually large number of Latinos wearing red. (To him, it seemed obvious that they were displaying an affiliation with the Bloods). Ordinarily, they would gather at another pizzeria across the street. There were also a number of the Asians who usually frequented the Internet café, which is where Macson socialized with Simon and defendants. Sarn had skipped school, and Macson was fairly certain at this point that Sarn was not going to show up, but he lingered to make sure that he was not accused of being a no-show. He spoke to his father in the pizzeria, then came out and saw Simon. He spoke briefly with him, letting him know the fight would not take place. He saw defendant Chiu, but did not speak with him. He heard people discussing the possibility of a fight, and had people ask him what was going on between him and Sarn. He decided to leave because it was time for one of the pizza deliverymen to drive him and his cousins home.

Our focus now switches to Simon. On the evening after the shooting, a detective had intercepted a car driving Simon away from his home; the driver was a resident of Magalia. The driver denied being a member of the Chinese gang, but gave the detective the impression that he had intimate knowledge of the gang's operations; in discussing these, he would occasionally lapse into the first person plural. The detective and Simon's probation officer both questioned Simon about the shooting over the course of several hours. Simon testified under a grant of use immunity, and the jury also viewed the lengthy videotape of his interrogation.

At trial, Simon denied speaking with Macson on the evening before the shooting about Sarn's threats. He claimed to have heard about it only through an Internet chat room, where some people were discussing the possibility that Sarn, "the Mien kid," would show up with some friends for a fight in which he might use a gun on the "pizza guy's dad." He did not take the rumor seriously, but had his sister drop him off at the location only out of curiosity, not out of any intent to assist Macson. He had asked defendant Chiu that morning if he had heard about the fight that was

supposed to take place at the Internet café where they usually went on a daily basis, and defendant Chiu indicated that he had heard about it in some fashion or other. Simon did not talk at any point with defendant Hoong (whom he claimed that he barely knew). After his sister dropped him off, he went into the Internet café. When he came out, he saw defendants and Rickie Che sitting on the trunk of a car. He greeted a Vietnamese girl named Teresa that he had known since middle school. After a brief conversation with her (during which, according to Teresa, he mentioned that he was there to back up a friend in a possible fight), he went and sat in front of the Internet café to smoke a cigarette. He had not talked with anyone about the need to bring a gun to the possible fight, and had never seen Rickie Che fire a gun.

In his interrogation, however, Simon stated that Macson had called him and defendants on the night before the shooting. Simon said to Macson that he might show up if not otherwise busy. The next day at school, defendant Chiu mentioned getting a call from Macson. Defendant Chiu had been planning to go over to the Internet café anyway, but Simon did not have any intention of joining him. However, while his sister was driving him home from school, he had a change of heart in case "the Mien kid does go crazy."

Defendant Chiu testified. A girl had phoned him on the night before the shooting to tell him about the possible fight between Macson and Sarn. He did not speak to anyone else that night. Knowing both parties, he did not take the threat of gunplay seriously. The next day, he asked Simon if he was going to the Internet café, their usual destination after school. Simon said he had not planned to go, and asked if defendant Chiu had "heard about it." Defendant Chiu took this as a reference to the Macson/Sarn fight, and indicated that he was aware of it. They did not discuss the need to back up Macson in the fight. Defendant Chiu also told another friend at school about the impending fight, but did not think that he would have said anything about the potential for gunplay. (The friend's recollection at trial, however, was that defendant Chiu specifically urged him to attend because an unnamed friend might shoot if he got pressured.) Because Simon was not going to the Internet café, defendant Chiu did not want to ask him for a ride. He called defendant Hoong instead (who attended a different school), who said that Rickie Che was giving him a ride and would come get him. The three drove over to the Internet café without any discussion about the impending fight. Defendant Chiu was not aware of any weapons in their possession, nor had he ever been aware that Rickie Che would carry a gun. They parked the car on the curb just south of the pizzeria, facing west on the cross-street, and sat on the trunk. Defendant Chiu was surprised to see Simon was present, the latter having said that he was not coming. He noticed Macson in the crowd after school let out.

According to defendant Chiu, he noticed Teresa talking to some girlfriends and intended to attract her attention by imitating her voice in falsetto. This incensed Teresa, which in turn caught the attention of her longtime boyfriend nearby, who then confronted defendant Chiu; the latter then made a rude remark about Teresa's breasts ("nice rack"). Defendant Chiu claimed he had been unaware of the boyfriend's connection with Teresa, but did know him by sight from around school. The

accounts of what exactly happened thereafter at the two loci of the battle predictably vary.  The posturing between the two boys might have ended without incident, except that out of the corner of his eye, defendant Chiu claimed that he noticed someone throwing a punch at one of his companions, who had come up to support him. (According to Teresa, Joshua, the boyfriend, and other witnesses, the victim had also come to the boyfriend's side to support him when defendant Hoong and Rickie Che came up in support of defendant Chiu; it appeared to them that Rickie Che threw the first punch at the victim, hitting him and triggering what followed.)  In any event, defendant Chiu decided the fight was on and rushed at the boyfriend.  It is unclear whether he or the boyfriend threw the first blow at the other; however, both wound up on the ground.

In the fight between defendant Chiu and the boyfriend, Simon claimed he had at first intended only to be a bystander until he was knocked down by an unknown assailant.  He got quickly to his feet to attempt to assist defendant Chiu, whom he claimed was being overwhelmed by a crowd of 10-15 of the Latino group.  He was not focused on what was happening with Rickie Che and defendant Hoong.

Teresa recalled only the boyfriend's female cousin coming to his aid, who hit defendant Chiu repeatedly on the side of his head until he fell, giving the boyfriend time to stand up.  She was focused only on what was happening with the boyfriend.

The boyfriend also was focused only on his antagonist once the fight began. He mentioned only his female cousin and one other Latino friend hitting defendant Chiu.  Eventually, the boyfriend was able to knee defendant Chiu in the face.

The female cousin testified to hitting defendant Chiu.  When the other Latino friend *and* Joshua came to the boyfriend's aid, she backed off.  She noticed the largest of the Asians (which would be defendant Hoong) swinging a knife at the victim.

Joshua stated that Rickie Che threw the first punch at the victim's head after the victim challenged him for giving him a "hard" stare.  Joshua at first came to the boyfriend's aid, walloping defendant Chiu in the back of the head. He then joined the fray taking place between the victim, Rickie Che, defendant Hoong, and others.  He exchanged punches with defendant Hoong, while the victim fought with Rickie Che. He recalled that one of his Latino friends ran around and hit defendant Hoong from the other side; there were greater numbers on the Latino side than the Asian side, but Joshua did not otherwise specify the participants.  After a couple of minutes, he urged the boyfriend, his female cousin, and the victim to get going before the police arrived.  Joshua heard defendant Chiu shout at Rickie Che to get the "strap," a slang term for a firearm.  He and the victim broke off their fight and turned to leave. Rickie Che went over to the car.  As the victim and Joshua began to follow after the boyfriend and the female cousin down the cross-street to the west, defendant Hoong blocked their path.  He swung a small knife at the victim, stabbing him in the arm as the victim attempted to get around him.  As they began to run after the others, Joshua heard people who were not involved in the fighting call out a warning that Rickie Che had a gun. Joshua did not mention anything in his testimony about hearing anyone urging Rickie Che to shoot.

According to Teresa, she did not recall defendant Chiu and the boyfriend shouting anything at each other. As she was watching them, she heard someone somewhere else in the crowd shout a warning about a gun. She fled with her girlfriend toward a nearby light-rail station. As they ran up the street, they heard a gunshot behind them.

The boyfriend heard an unfamiliar voice cautioning about a gun. He had been using fight words during his battle with defendant Chiu, and he did not recall any other comments about guns until then. At the mention of a gun, the two broke off their fight and looked around. The boyfriend saw Rickie Che pointing the gun at him and telling him to run. The boyfriend was more than happy to comply with the command. He fled west down the cross-street and heard a shot behind him.

The female cousin recalled that it was the *boyfriend* who shouted a warning about the gun. She also claimed to have heard what she assumed to have been one of the Asians urging the use of the gun, but she was not sure who it was. Two other bystanders concurred in hearing one of the Asians urge the use of the gun, but also were not able to specify which Asian; one of them, however, was certain that it was an Asian near the shooter and not defendant Chiu, who was still engaged in fighting with the boyfriend and others (this bystander had not heard any warning about the gun).

After Simon had hit the ground for the third time in the fight, he saw Rickie Che running to the car and heard someone shout the warning about the gun and then heard a gunshot. He assumed one of the Latinos had fired a gun, but he then saw Rickie Che stick a black object into his waistband as he ran back to the car. He never heard anyone urging the use of the gun.

In the midst of his fight with the boyfriend, defendant Chiu noticed the former began to struggle to break away and run off after he was able to shake loose. Defendant Chiu then turned and noticed Rickie Che holding a gun. Neither he nor the boyfriend had said anything about guns (or straps) during their fight, nor had he heard anyone else say anything about a gun (either as a warning or as a provocation for its use).

There was at least unanimity about the fatal event. After retrieving a gun from his car, Rickie Che fired at the victim as he was running down the cross-street with Joshua. The gunshot wound to the back of his head was instantly fatal. The knife wound in the front of his upper left arm had not damaged any major blood vessels.

According to Simon, the gunshot had not deterred some of those lying on the ground near defendant Chiu from continuing to throw punches. Simon was able anyway to help defendant Chiu to his feet and walk to Rickie Che's car, in which defendants and Simon drove off. No one spoke in the car about what happened. Rickie Che first dropped off Simon at his nearby home, and then defendant Chiu.

As earlier noted, the police intercepted an effort to spirit Simon away. Defendant Chiu, however, accepted a ride from two unidentified men who had phoned his home. He did not know their names, but recognized them as associates of Rickie Che. This was a better alternative than sitting around his home worrying

about his association with the shooter.  South of Elk Grove, they stopped to eat, where defendant Hoong joined their company.  Thereafter, they drove to an unknown location (later revealed to have been somewhere in Alameda), where they stayed for about a week.  Defendant Chiu's brother phoned him to say that his prospects did not look good at home.  After contacting a lawyer, defendant Chiu arranged to return home in order to surrender himself.[2]

## II.  GROUNDS RAISED/DEFENSES

Hoong raises eight grounds:  (1) the trial court erred in failing to instruct on the defense theory of imperfect self-defense and defense of others; (2) the use of the natural and probable consequence doctrine to impose liability as an aider and abettor violates the Due Process and Equal Protection Clauses; (3) California law on aiding and abetting in homicide cases violates the Equal Protection Clause; (4) the failure to present the claim in Ground Three on appeal constituted ineffective assistance of appellate counsel; (5) CALJIC 3.00 was misleading in violation of the Fourteenth Amendment; (6) failure to raise the claim in Ground Five on appeal constituted ineffective assistance of appellate counsel; (7) the use of CALJIC 2.51 lightened the prosecutions burden of proof to less than that of proof beyond a reasonable doubt; and (8) the admission of Hoong's juvenile convictions for auto burglary and felony assault violated the Due Process Clause.[3]  Respondent does not assert any affirmative defenses.[4]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

---

[2] *Id.* at *1-5.

[3] Hoong presented his first, sixth, seventh, and eighth grounds to the California appellate courts on direct appeal.  The second, third, fourth, and fifth grounds were presented in his state habeas petition to the California Supreme Court.

[4] Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2012).

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[5]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[6]  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[7]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[8]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be "objectively unreasonable," not just "incorrect or erroneous."[9]  The Supreme Court has made

clear that the objectively unreasonable standard is "a substantially higher threshold" than simply

---

[5] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[6] *Williams*, 529 U.S. at 412 (alteration added).

[7] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[8] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[9] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

believing that the state-court determination was incorrect.[10]   "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[11]   In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[12]   Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[13]

The Supreme Court recently underscored the magnitude of the deference required:

As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in

---

[10] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[11] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[12] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[13] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[14]

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[15]  State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[16]  This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[17]

Under California's unique habeas procedure, a prisoner who is denied habeas relief in the superior court files a new original petition for relief in the court of appeal.  If denied relief by the court of appeal, the defendant has the option of either filing a new original petition for habeas relief or a petition for review of the court of appeal's denial in the California Supreme Court.[18]

---

[14] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[15] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[16] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[17] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[18] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002) (citations omitted) (discussing California's "original writ" system).

This is considered as the functional equivalent of the appeal process.[19]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[20]  This presumption applies to state-trial courts and appellate courts alike.[21]

A state court is not required to give reasons before its decision can be deemed to be "adjudicated on the merits."[22]  When there is no reasoned state-court decision denying an issue presented to the state, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[23]  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."[24]  Where the presumption applies, this Court must perform an independent review of the record to ascertain whether the state-court decision was "objectively unreasonable."[25]  In conducting an independent review of the record, this Court

---

[19] *See id.* at 222 ("Thus, typically a prisoner will seek habeas review in a lower court and later seek appellate review in a higher court . . . .").

[20] 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).

[21] *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence. Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002))).

[22] *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011)*.*

[23] *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

[24] *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

[25] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam)).

presumes that the relevant state-court decision rested on federal grounds,[26] giving that presumed

decision the same deference as a reasoned decision.[27]   The scope of this review is for clear error

of the state court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state
> court's decision, we can view it through the "objectively reasonable" lens ground by
> *Williams*. . . . Federal habeas review is not *de novo* when the state court does not
> supply reasoning for its decision, but an independent review of the record is required
> to determine whether the state court clearly erred in its application of controlling
> federal law.  Only by that examination may we determine whether the state court's
> decision was objectively reasonable.[28]

"[A]lthough we independently review the record, we still defer to the state court's ultimate

decision."[29]

## IV.  DISCUSSION

For convenience and to avoid unnecessary duplicative recitations of the applicable legal

standards to grounds involving essentially the same subject matter, the Court has divided its

---

[26] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris*, 489 U.S. at 263.

[27] *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[28] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (citation omitted). *But cf. Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) ("Our standard of review is not controlled by *Delgado v. Lewis* . . . There, we held that where a state court provides no rationale for a decision, a habeas court does not apply de novo review, but instead determines whether the state decision was objectively unreasonable based on its independent reading of the record.  Here, however, the state court was not silent as to its reasoning . . . .  Therefore, we review de novo whether Lewis waived his right to conflict free counsel . . . .").

[29] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

discussion into two parts:  errors based upon alleged errors in the jury instructions and non-instructional errors.

## A.      Instructional Errors

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."[30]  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.[31]  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.[32]

It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right and may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.[33]  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.[34]  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due

---

[30] *Boyde v. California,* 494 U.S. 370, 380 (1990).

[31] *Francis v. Franklin*, 471 U.S. 307, 309 (1985).

[32] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh,* 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Franklin*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

[33] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

[34] *Id*. at 72-73.

Process clause has limited operation."[35]  Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.[36]  "The inquiry is whether the trial court's refusal to give the [requested] instruction 'so infected the entire trial that the resulting conviction violates due process.'"[37]

Ground 1:  Failure to Instruct on Imperfect Self-defense/Defense of Others

The trial court declined to instruct the jury on the defense theories of imperfect self-defense or defense of others.  Hoong contends that this omission denied him the right to have his guilt established by proof beyond a reasonable doubt and the opportunity to present a defense.  In rejecting Hoong's claim that the trial court erred in declining to so instruct the jury, the California Court of Appeal held:

> During the conference on jury instructions, the trial court indicated its tentative decision to refuse to instruct on the concepts of reasonable or unreasonable self-defense except in connection with the target misdemeanor of simple assault (where it instructed the jury only on the principles of the use of ordinary force in reasonable self-defense).  Defendant Chiu's attorney stated that he did not want any other instructions on self-defense, but did not elaborate on his reasoning.  On behalf of absent counsel for defendant Hoong, he lodged a request for the additional self-defense instructions, which the court denied.
>
> As we noted in the beginning of this opinion, the prosecution's closing argument contended that defendant Chiu encouraged Rickie Che to commit first degree murder, emphasizing the evidence that defendant Chiu was aware Rickie Che was armed and likely to fire his gun at opponents in a fight and that Joshua heard him tell Rickie Che to get the gun.  Alternatively, he argued that both defendants were guilty of second degree murder as a consequential offense under the circumstances of the target misdemeanors.  To the extent the prosecutor addressed the self-defense

---

[35] *Id.*

[36] *See Henderson v. Kibbe,* 431 U.S. 145, 155 (1977).

[37] *Jackson v. Edwards*, 404 F.3d 612, 624 (2d Cir. 2005) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

instruction connected with the latter theory, he asserted that defendant Chiu could not have called for the gun in order to defend himself from the beating he was receiving because he and his friends had initiated the fight.

In closing argument, counsel for defendant Chiu asserted that his client did not have any knowledge of the presence of Ricky Che's gun, and that Joshua's testimony about his client directing Ricky Che to get it was not corroborated by anyone else and not worthy of belief. He noted that the opponents had broken off the fight with him and were fleeing when they saw the gun. Counsel for defendant Hoong argued that there was an absence of any evidence that his client even knew about the intended fight or agreed to participate in it, let alone that defendant Chiu would provoke a different group of people and Rickie Che would start the fight, or that the latter had a gun with him that he would use. He also contended that a death was not a reasonable consequence of a fight among the teenagers. To the extent he raised self-defense at all, it was to argue that his client's use of the knife was to ward off his own attackers, not to encourage or assist Rickie Che.

On appeal, defendants argue that the court erred in refusing to instruct on self-defense (reasonable or not). They also argue the court erred in failing to instruct sua sponte on those alternatives in the context of defense of others.

*A*

Liability as an accomplice for an intended offense based on the actions of another confederate requires knowledge of the confederate's purpose and an intent to aid or encourage that purpose. (*People v. Lee* (2003) 31 Cal. 4th 613, 623-624, 3 Cal.Rptr.3d 402, 74 P.3d 176.) This "derivative" liability for an intended offense combines liability for the confederate's acts with the accomplice's acts and mental states. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117, 108 Cal. Rptr. 2d 188, 24 P.3d 1210.) There is a limitation on the sense in which this criminal liability is derivative: accomplices are liable for a confederate's *acts,* but are liable only for their *own* mental state. (*McCoy, supra,* 25 Cal.4th at pp. 1118-1119, 108 Cal. Rptr. 2d 188, 24 P.3d 1210.) As a result, this means in the context of an intended homicide that an accomplice and a confederate can be guilty of different degrees based on their mental state (or divergent verdicts of guilt and acquittal based on defenses personal to each). (*Id.* at pp. 1119-1120, 108 Cal. Rptr. 2d 188, 24 P.3d 1210.)

Therefore, under the prosecution theory of an intended homicide, defendants in theory could assert that they had a fully justified or less culpable mental state than Rickie Che. As we shall show, the absence of evidence worthy of consideration to support a theory of reasonable self-defense (or more accurately, Rickie Che acting in defense of his accomplice) foreclosed its application to either defendant. However, there is evidence permitting defendant Chiu to be convicted of only the lesser offense of voluntary manslaughter based on an *unreasonable* belief in the need for another to defend him with deadly force. As the trial court failed to provide instructions defining this principle sua sponte, we must reverse defendant Chiu's murder conviction (and vacate the related enhancements) because it is reasonably probable that a properly instructed jury would convict him of only the lesser offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 158-159, 162, 178, 77 Cal. Rptr. 2d

15

870, 960 P.2d 1094.)  As for defendant Hoong, however, there is no evidence worthy of consideration in support of this lesser offense, and therefore the court did not have a duty to instruct on it sua sponte as to him.

An aggressor or a mutual combatant must retreat and communicate withdrawal from the fight before being entitled to assert any form of self-defense; the exception is where a simple assault is met with deadly or other "excessive" force that is too sudden to permit safe retreat and withdrawal, at which point the defendant may employ deadly force in self-defense.  (1 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Defenses, § 75, pp. 409-410; *People v. Hecker* (1895) 109 Cal. 451, 464, 42 P. 307; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180, 39 Cal. Rptr. 3d 433 [error to fail to instruct on this principle merely because defendant was initial aggressor]; *People v. Quach* (2004) 116 Cal.App.4th 294, 301-302, 10 Cal. Rptr. 3d 196 [same].)  Force is excessive where it is unreasonable under the circumstances. (1 Witkin & Epstein, Cal. Criminal Law, *supra*, § 72(2), p. 407; *People v. Randle* (2005) 35 Cal.4th 987, 1002-1003, 28 Cal. Rptr. 3d 725, 111 P.3d 987 [beating exceeded that which was necessary to respond to trespass to property, and continued after property retrieved; "aggressor" defendant thus entitled to act with deadly force in defense of accomplice].)  The justification for resort to deadly force has narrowed over the years, so that the right presently arises only where strictly necessary.  (See *People v. Hardin* (2000) 85 Cal. App. 4th 625, 632-633, 102 Cal. Rptr. 2d 262.)  The right to employ deadly force in self-defense also ceases once a belief in imminent deadly peril is no longer reasonable.  (*Id.* at p. 634, fn. 7, 102 Cal. Rptr. 2d 262; *People v. Gleghorn* (1987) 193 Cal. App. 3d 196, 202, 238 Cal. Rptr. 82.)  An unreasonable resort to self-defense is subject to the same principles as true self-defense.  (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1, 30 Cal. Rptr. 2d 33, 872 P.2d 574 [applying basic principle foreclosing aggressor from asserting this theory].)

Under these principles, there is an absolute absence of any evidence that defendant Hoong, at the time he may have encouraged Rickie Che to shoot, could have been acting under a reasonable or unreasonable belief in the need to defend either himself or defendant Chiu.  Confronted with the gun, their opponents were all retreating.  There could not be any necessity at that point to actually employ the threatened deadly force.  As a result, the theories were not available to defendant Hoong at trial.[38]

Hoong contends that the California Court of Appeal's determination that there was no evidence to support the requested instructions was based upon an unreasonable determination of the facts in light of the evidence presented.[39]  Respondent argues that the California Court of

---

[38] *Chiu*, 2008 WL 4868626 at *5-7.

[39] Hoong quotes 28 U.S.C. § 2254(d)(2) in his petition.

Appeal's decision was an interpretation of state law, not cognizable in a federal habeas proceeding.  Hoong counters with the argument that the complete failure to instruct on imperfect self-defense infringes a federal constitutional right.  Hoong's reliance on *McNeil v. Middleton*[40] is misplaced.  Not only did the Supreme Court reverse *Middleton* on the facts presented, in *Middleton* the instruction given was erroneous under California law.  In *Middleton* the California Court of Appeal found that the error was cured by the prosecution's correct argument, the Ninth Circuit disagreed, and the Supreme Court agreed with the California Court of Appeal.  In this case, the failure to instruct did not constitute a violation of California law.  Alternatively, Hoong argues that the failure to give the requested instruction relieved the prosecution of its burden to establish every element of the offense of murder beyond a reasonable doubt.[41]

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[42]  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must undertake its inquiry by reference to the elements of the crime as set forth in state law.[43]  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[44]  A determination of state law by a state intermediate appellate court is also binding in a

---

[40] 344 F.3d 988, 995 (9th Cir. 2003), *rev'd*, 541 U.S. 433 (2004).

[41] *In re Winship*, 397 U.S. 358 (1970).

[42] *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

[43] *Jackson*, 443 U.S. at 324 n. 16.

[44] *Bradshaw v. Richey,* 546 U.S. 74, 76, (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

federal habeas action.[45]  This is especially true where the highest court in the state has denied review of the lower court's decision.[46]

A petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process.[47]  "[The Supreme Court has] long recognized that a mere error of state law is not a denial of due process."[48]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[49]  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."[50]  It is through this lens that this Court must view sufficiency of the evidence claims.  In this case, the California Court of Appeal determined that there was insufficient evidence to support an instruction on imperfect self-defense or defense of others under California law.  Although it might have been possible to draw a different inference from

---

[45] *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

[46] *Id.*; *see West,* 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court."); *Shannon v. Newland*, 410 F.3d 1083, 1087 (9th Cir. 2005) (same).

[47] *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996).

[48] *Cooke*,131 S. Ct. at 863 (internal quotation marks and citations omitted).

[49] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[50] *Smith v. Philips*, 455 U.S. 209, 221 (1982) (citations omitted); *see also Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) ("It is beyond dispute that we do not hold a supervisory power over the courts of the several States." (quoting *Dickerson v. United States*, 530 U.S. 428, 438 (2000))).

the evidence, this Court is required to resolve that conflict in favor of the prosecution.[51]  Hoong

bears the burden of establishing by clear and convincing evidence that these factual findings were

erroneous;[52] a burden Hoong has failed to carry.  Hoong is not entitled to relief under his first

ground.

Ground 2:  Use of Natural and Probable Consequences Doctrine

Hoong was tried as an aider and abettor.  Accordingly, the jury was instructed with

CALJIC 3.00, 3.01, and 3.02.

> Persons who are involved in committing a crime are referred to as principals
> in that crime.  Each principal, regardless of the extent or manner of participation, is
> equally guilty.  Principals include:
>    1.    Those who directly and actively commit the act constituting the crime;
> or
>    2.    Those who aid and abet the commission of the crime.
>    A person aids and abets the commission of a crime when he or she:
>    1.    With knowledge of the unlawful purpose of the perpetrator, and
>    2.    With the intent or purpose of committing or encouraging or
> facilitating the commission of the crime, and
>    3.    By act or advice, aids, promotes, encourages or instigates the
> commission of the crime.
>    One who aids and abets another in the commission of a crime or crimes is not
> only guilty of that crime, but is also guilty of any other crime committed by a
> principal which is the natural and probable consequences of the crimes originally
> aided and abetted.
>    In order to find the defendant guilty of the crime of murder, as charged in
> Count One, based upon aiding and abetting, you must be satisfied beyond a
> reasonable doubt that:
>    1.    The crime of assault or disturbing the peace was committed;
>    2.    The defendant aided and abetted one or both of those crimes;
>    3.    A coprincipal in those crimes committed the crime of murder; and
>    4.    The crime of murder was a natural and probable consequence of the
> commission of the crime of assault or disturbing the peace.

---

[51] *See Jackson*, 443 U.S. at 326.

[52] 28 U.S.C. § 2254(e)(1).

> In determining whether the crime of murder was a natural and probable consequence, you must apply an objective test, based not on what the defendant actually intended, but what a person of reasonable and ordinary prudence would have expected likely to occur.  In making this determination you must consider those circumstances which the defendant knew, taking into account all the facts and circumstances surrounding each particular defendant's conduct.
>
> A "natural" consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. "Probable" means likely to happen.[53]

The jury was then instructed on the elements of the target crimes—assault as the willful and unlawful commission of an act likely to result in the application of physical force on another person,[54] and disturbing the peace as the act of fighting with another person in a public place.[55]

As he did in his state habeas petition, Hoong argues that under California law a murder conviction cannot be predicated upon the natural and probable consequences arising out of aiding or abetting an assaultive crime.[56]  Hoong further argues that a murder conviction must be predicated upon a non-assaultive crime, express malice aforethought, or on a conscious-disregard-for-life malice.  Consequently, according to Hoong, use of the natural and probable consequences doctrine as a basis for a murder conviction lightens the state's burden of proof to

---

[53] Reporter's Transcript, Vol. 8 at 2271-73.

[54] Reporter's Transcript, Vol. 8 at 2274-75.

[55] Reporter's Transcript, Vol. 8 at 2275-76.

[56] In making this argument, Hoong relies on *People v. Sarun Chun*, 203 P.3d 425 (Cal. 2009).

something less than beyond a reasonable doubt.[57]  The California Supreme Court summarily denied Hoong relief without opinion or citation to authority.

This Court must assume that the California Supreme Court denied Hoong's habeas petition on the merits.[58]  That being so, this Court must also presume that the California Supreme Court correctly applied state law and implicitly held that the natural and probable consequences doctrine was properly applied in this case under California law,[59] which is binding on this Court.[60]  Because he has failed to establish that the jury was incorrectly instructed, Hoong has not established a due process violation under either *Sandstrom* or *Chapman*.  Hoong is not entitled to relief under his second ground.

Ground 5:  CALJIC 3.00 Unconstitutional

As noted above, CALJIC 3.00 as given in this case informed the jurors that "[e]ach principal, regardless of the extent or manner of participation, is equally guilty."  Hoong argues that this misstates state law,[61] or is at least so ambiguous that it is likely to be applied in an

---

[57] In making this argument, Hoong relies on *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979).  In his state habeas petition, Hoong did not cite *Sandstrom*.  Instead, Hoong based his federal constitutional argument on a theory that it could not be shown that beyond a reasonable doubt that the jury did not find him guilty of first-degree murder on the erroneous application of the natural and probable consequences doctrine, citing *Chapman v. California*, 386 U.S. 18, 23-24 (1967).

[58] *Richter*, 131 S. Ct. at 784-85.

[59] *See Walton,* 497 U.S. at 653 (it is presumed that the state court knew and correctly applied state law).

[60] *See McGuire*, 502 U.S. at 67-68 (a federal habeas court cannot reexamine a state court's interpretation and application of state law)

[61] In making this argument, Hoong relies on *People v. Nero*, 104 Cal. Rptr. 3d 616, 622-23 (Ct. App. 2010); *People v. Samaniego*, 91 Cal. Rptr. 3d 874, 887 (Ct. App. 2009); *People v. Woods*, 11 Cal. Rptr. 2d 231, 239-40 (Ct. App. 1992).

ambiguous manner[62] and violates the Fourteenth Amendment.[63]  Except for his *Sandstrom*-based

argument, which he did not present to the California Supreme Court, Hoong made these same

arguments in his habeas petition to the California Supreme Court, which summarily denied relief

without opinion or citation to authority.

With respect to his contention that CALJIC 3.00 misstates state law, this Court cannot

reach that issue for the same reasons as stated above with respect to Hoong's second ground.

With respect to his *Sandstom* claim, even disregarding the fact that he has not properly exhausted

his state-court remedies,[64] Hoong does not explain how the quoted part of the instruction is

ambiguous or how it might be applied in an unconstitutional manner.  Hoong has the burden of

establishing a constitutional violation, a burden he has utterly failed to carry.  Hoong is not

entitled to relief under his fifth ground.

Ground 6:  Ineffective Assistance of Appellate Counsel

Hoong contends that appellate counsel was ineffective for failing to raise his fifth ground

on appeal.  Hoong also raised this issue as an alternative in his state habeas petition.  Under

*Strickland*, to demonstrate ineffective assistance of counsel, the petitioner must show both that

his counsel's performance was deficient and that the deficient performance prejudiced his

defense.[65]  The failure of appellate counsel to raise meritless or weak issues does not constitute

---

[62] In making this argument, Hoong relies on *McGuire*, 502 U.S. at 70-75.

[63] In making this argument, Hoong relies on *Sandstrom*, 442 U.S. at 524.

[64] 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases); *Duncan v. Henry,* 513 U.S. 364, 365-66 (1995); *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009).

[65] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

ineffective assistance of counsel.[66]   Because the California Supreme Court denied Hoong relief on his fifth ground, Hoong must show that he would have obtained a more favorable result on direct review.   Hoong has not made such a showing.   Hoong is not entitled to relief under his sixth ground.

Ground 7:  CALJIC. 2.51 Unconstitutionally Applied

The jury was instructed that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proven beyond a reasonable doubt."[67]   The jury was also instructed with CALJIC 2.51 as follows:  "[m]otive is not an element of the crime charged and need not be shown.  However, you may consider motive or lack of motive as a circumstance in this case."[68]   Hoong argues that the giving of CALJIC 2.51 lightened the prosecution's burden to prove gang motive beyond a reasonable doubt.   Hoong further argues that his murder conviction had to have been established derivatively through the natural and probable consequences doctrine for which gang motive was an essential fact to be proven beyond a reasonable doubt.   The California Court of Appeal rejected Hoong's arguments:

> Defendants contend that the pattern instruction on motive either lightened or relieved the prosecution's burden of proof on the gang enhancement and the murder verdict (the latter asserted without any explanation).
> This is true only in the circumstance of a crime with an unusual mental state. *People v. Maurer* (1995) 32 Cal. App. 4th 1121, 38 Cal. Rptr. 2d 335 involved misdemeanor child annoyance, which requires proof that a defendant was *motivated* by unnatural or abnormal sexual interest.  The court instructed accordingly on that

---

[66] *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (holding that appellate counsel does not have an obligation to raise every nonfrivolous argument); *Miller v. Keeney*, 882 F.2d 1428, 1428 (9th Cir. 1989) (holding that appellate counsel's failure to raise a weak issue did not constitute ineffective counsel).

[67] Reporter's Transcript, Vol. 8 at 2263.

[68] Reporter's Transcript, Vol. 8 at 2268.

element.   We explained that this results in a jury being instructed both that "motivation" is an element but "motive" is not, a distinction that we did not believe lay jurors could draw on their own, which therefore left the possibility of removing the element of "motivation" from the prosecution's burden of proof.  (*Id.* at p. 1127, 38 Cal. Rptr. 2d 335.)

The Supreme Court has distinguished our decision from the usual situation where the mental state for an offense does not employ a term akin to "motive." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1135, 40 Cal. Rptr. 3d 118, 129 P.3d 321 ["intent" as used in instruction for rape-murder special circumstance not interchangeable with "motive"]; *People v. Cash* (2002) 28 Cal.4th 703, 738-739, 122 Cal. Rptr. 2d 545, 50 P.3d 332 [robbery-murder special circumstance]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503-504, 117 Cal. Rptr. 2d 45, 40 P.3d 754 ["malice," "intent," and "purpose" as used in defining mental states for various crimes are not synonymous with "motive" and therefore no possibility of misleading jury].)  Defendants fail to identify any similar opportunity for instructional mischief in the present case, where the necessary intention for the gang enhancement is the *specific intent* "to promote, further, or assist in any criminal conduct by gang members" (Pen. Code, § 186.22, subd. (b)(1)), or in the homicide instructions.  We reject this argument as a result.[69]

In support of his arguments, Hoong cites *People v. Maurer*[70] and *Winship*.  The California Court of Appeal discussed *Maurer* and concluded that it did not apply in this case to either the gang-related enhancement or the homicide instructions.  That, as Respondent correctly argues, is a question of state law beyond the purview of this Court in a federal habeas petition,[71] which ends the inquiry.  Hoong is not entitled to relief under his seventh ground.

---

[69] *Chiu*, 2008 WL 4868626 at *13.

[70] 38 Cal. Rptr. 2d 335, 338-39 (Ct. App. 1995) (holding that not excluding Cal. Penal Code § 647.6 (misdemeanor child annoyance) from a CALJIC 2.51 motive instruction was error).

[71] In his Traverse, Hoong argues that the California Court of Appeal did not address his argument *vis-a-vis* the murder conviction.  Hoong is clearly mistaken.  Although the Court of Appeal may not have specifically addressed murder in its discussion, the court specifically held that the giving of CALJIC 2.51 was not error with respect to the homicide instructions.  Even if it had not, the application of CALJIC 2.51 in this case is a question of state law not within the purview of a federal habeas proceeding.

**B.      Non-instructional Errors**

Ground 3:  California Law on Aiding and Abetting in Homicide Cases

Hoong contends that under California law the *mens rea* of a direct aider and abettor in a

homicide case is assessed independently of the *mens rea* of the direct perpetrator.  That is, one

who directly aids and abets in a homicide may be guilty of a greater or lesser degree of criminal

homicide, or not guilty at all, independent of the guilt *vel non* of the direct perpetrator.[72]  On the

other hand, according to Hoong, the *mens rea* of an indirect aider and abettor (aiding and abetting

in a crime the natural and probable circumstances of which is criminal homicide) is determined

by the reasonably foreseeable *mens rea* of the direct perpetrator, irrespective of his own *mens

rea*.[73]  Hoong argues that, had his *mens rea* been assessed independently of the direct shooter, the

jury could have found him guilty of a lesser crime, or not guilty at all.  According to Hoong, this

disparate treatment of direct and indirect aiders and abettors violates the Equal Protection Clause.

Hoong cites *Brecht* for the proposition that the error worked a substantial and injurious injury.

Hoong presented this argument to the California Supreme Court in his state habeas petition,

citing as his federal authority *Chapman*.[74]

In response, Respondent correctly argues that Hoong has not cited any Supreme Court

authority for his proposition that the disparate treatment of direct and indirect aiders and abettors

---

[72]  In making this argument, Hoong relies on *People v. McCoy*, 34 P.3d 1210, 1214 (Cal.
2001).

[73]  In making this argument, Hoong relies on *Woods*, 11 Cal. Rptr. 2d at 239-40.

[74]  386 U.S. at 23-24 (the "harmless beyond a reasonable doubt" standard applies on direct
review to constitutional errors).

violates the Equal Protection Clause.  In his Traverse, Hoong cites *Eisenstadt v. Baird*[75] in support of his equal protection argument.  Hoong also argues that he has met the general broad "equal protection" standard enunciated in *Baird*, citing *Knowles v. Mirazayance*.[76]  This Court rejects Hoong's arguments.

First, this Court notes that in both his state court habeas petition and his Petition before this Court, Hoong cites Supreme Court authority solely for the effect of a constitutional error, but omits citation to any authority supporting his equal protection argument.  It is not until his Traverse that Hoong cites any Supreme Court authority on his equal protection argument.  Even then, he fails to cite any authority that applied the *Baird* principle to the alleged disparate treatment accorded to direct and indirect aiders and abettors, instead relying on an argument that disparate treatment violates a general constitutional rule.  In so doing, Hoong ignores the governing principle concerning the application of a general rule also applied in *Mirazayance*:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S. Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule,

---

[75] 405 U.S. 438, 446-47 (1972) (the contraceptive case applying the principle that equal protection requires that "[a] classification 'must be reasonable, not arbitrary, and must rest on some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." (quoting *Reed v. Reed*, 404 U.S. 71, 75-76 (1971))).

[76] 556 U.S. 111, 122 (2009) ("[R]elief may be granted only if the state-court decision unreasonably applied the more general standard for ineffective-assistance-of-counsel claims established by *Strickland* . . . .).

the more leeway courts have in reaching outcomes in case-by-case determinations").[77]

Again overlooking Hoong's failure to properly exhaust his state-court remedies, this Court also notes that Hoong misstates the holding in *Woods.*  Indeed, *Woods* holds the opposite of what Hoong contends.

> Because this analysis requires separate factual determinations for (1) what crimes have been committed, and (2) what crimes are the reasonably foreseeable consequences of the offense originally contemplated, it is self-evident that *the aider and abettor does not stand in the same position as the perpetrator.*  While the perpetrator is liable for *all* of his or her criminal acts, the aider and abettor is liable vicariously only for those crimes committed by the perpetrator which were reasonably foreseeable under the circumstances.  Accordingly, an aider and abettor may be found guilty of crimes committed by the perpetrator which are less serious than the gravest offense the perpetrator commits, i.e., *the aider and abettor and the perpetrator may have differing degrees of guilt based on the same conduct depending on which of the perpetrator's criminal acts were reasonably foreseeable under the circumstances and which were not.*[78]

Even if the deficiencies in Hoong's equal protection claim are overlooked, in this case, as the California Court of Appeal noted, the jury could have found that Hoong actually encouraged the homicide.  As the California Supreme Court recently stated:

> "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."  (*People v. Beeman* (1984) 35 Cal.3d 547, 561, 199 Cal. Rptr. 60, 674 P.2d 1318.)  Furthermore, under the "natural and probable consequences" doctrine, an aider and abettor is guilty not only of the offense he or she intended to facilitate or encourage, but also any reasonably foreseeable offense committed by the person he or she aids and abets. (*People v. Prettyman* (1996) 14 Cal.4th 248, 261, 58 Cal. Rptr. 2d 827, 926 P.2d 1013.)[79]

---

[77] 556 U.S. at 123.

[78] *Woods,* 11 Cal. Rptr. 2d at 239-40 (emphasis in the original).

[79] *People v. Gonzales*, 256 P.3d 543, 576 (Cal. 2011).

Thus, Hoong's guilt was founded on the factors outlined in *Beeman*, without resort to the "natural and probable consequences" doctrine.  Hoong is not entitled to relief under his third ground.

Ground 4:  Ineffective Assistance of Appellate Counsel

Hoong contends that, because appellate counsel did not raise the third ground on direct appeal, his representation was ineffective.  Because Hoong has not shown any reasonable probability that he would have prevailed had he raised the third ground on direct appeal, his corresponding claim that appellate counsel was ineffective for failing to raise it also fails.  Hoong is not entitled to relief under his fourth ground.

Ground 8:  Admission of Prior Juvenile Convictions

The trial court allowed the admission into evidence of two juvenile convictions incurred by Hoong; one for auto burglary and the other for a felony assault.  Hoong argues that because the evidence of these crimes was superfluous, provocative, and inflammatory, their admission into evidence constituted an abuse of discretion under California Evidence Code § 352, resulting in a denial of due process.  The California Court of Appeal rejected Hoong's position, holding:

> Defendant Hoong (in echo of his objection in the trial court) contends his prior offenses were cumulative of other evidence of seven predicate offenses that the Chinese gang committed.  This reduced their probative value to a minimum, which their prejudicial effect outweighed.  Therefore, the trial court abused its discretion in admitting the evidence of the prior offenses.  (E.g., *People v. Leon* (2008) 161 Cal. App. 4th 149, 169, 73 Cal. Rptr. 3d 786.)
>
> Since, as we have earlier noted, we will be vacating the gang enhancements because there is insufficient evidence to support them, the point is moot. Defendant Hoong attempts to claim this evidence also prejudiced the jury's consideration of his guilt of the substantive offense.  However, this claim ignores the presumption that jurors heed the court's limiting instructions except in the most egregious circumstances (such as the inculpatory confession of a codefendant), a principle essential to the entire system of trial by jury; we otherwise court judicial anarchy because there would not be any point either in instructing a jury or in reversing a

conviction for improper instructions. (*Marshall v. Lonberger* (1983) 459 U.S. 422,
438, 103 S. Ct. 843, 74 L .Ed.2d 646, fn. 6 [74 L. Ed.2d 646]; *Parker v. Randolph*
(1979) 442 U.S. 62, 64, 74-75, 99 S. Ct. 2132, 60 L. Ed.2d 713 & fn. 7 [60 L. Ed.2d
713] [plur. opn. of Rehnquist, J.]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1120-
1121, 240 Cal. Rptr. 585, 742 P.2d 1306.)  We therefore do not consider this issue
any further.[80]

The only argument that Hoong advances with respect to the use of this evidence is that

the murder conviction was somehow predicated upon the gang motive.  Hoong does not,

however, provide any argument for his conclusion.  Even if the court were to accept Hoong's

hypothesis that there was a nexus between the two juvenile convictions admitted on the gang

enhancement allegation and the murder conviction, Hoong would not prevail.

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional

restraints on ordinary evidentiary rulings by state trial courts."[81]  "The introduction of unfairly

prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of

due process unless the evidence is so extremely unfair that its admission violates fundamental

conceptions of justice."[82]  "[T]he Due Process Clause does not permit the federal courts to

engage in a finely tuned review of the wisdom of state evidentiary rules."[83]  In criminal actions,

"[t]he States are free to provide such procedures as they choose, including rules of evidence,

provided that none of them infringes a guarantee in the Federal Constitution."[84]  The Supreme

Court has made clear that federal habeas power does not allow granting relief on the basis of a

---

[80] *Chui*, 2008 WL 4868626 at *13.

[81] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

[82] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[83] *McGuire*, 502 U.S. at 72 (quoting *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6
(1983)).

[84] *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence.[85]  In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights.[86]  For example, the Supreme Court has barred the introduction of evidence in state court criminal proceedings that violated the Fourth Amendment (search and seizure),[87] Fifth Amendment (confessions),[88] Sixth Amendment (Confrontation Clause),[89] and (right to counsel).[90]

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code § 352, permits the exclusion of evidence if its probative value is "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and

---

[85] *McGuire*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[86] *McGuire*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

[87] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[88] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[89] *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (transcript of preliminary hearing without assistance of counsel to confront and cross-examine absent witness inadmissible).

[90] *Burgett*, 389 U.S. at 114-15 (evidence of prior conviction obtained in violation of Sixth Amendment right to counsel inadmissible).

403 . . . ."[91]  California employs a similar rule.[92]  Although the Ninth Circuit has suggested that

an abuse of discretion may also amount to a constitutional violation,[93] the Supreme Court has

never held that abuse of discretion is an appropriate basis for granting federal habeas relief.

Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of

discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.[94]

In this case, as the California Court of Appeal noted (and Hoong acknowledges), the trial

court gave an instruction limiting the use of those convictions to the gang-related enhancement

allegation.  As did the California Court of Appeal, this Court also assumes in the absence of

evidence to the contrary that the jury followed those instructions.[95]  Other than to contend that the

Court of Appeal's reliance on this principle was an unreasonable application of the presumption,

Hoong does not provide any evidentiary support for this conclusory statement.  Hoong is not

entitled to relief under his eighth ground.

---

[91] *United States v. Abel*, 469 U.S. 45, 54 (1984); *see Boyd v. City and County of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).

[92] *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

[93] *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).

[94] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (citing § 2254(d)(1))).

[95] *Weeks*, 528 U.S. at 234; *Marsh,* 481 U.S. at 206 (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Franklin*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

## V.  CONCLUSION AND ORDER

Hoong is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[96]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[97]

The Clerk of the Court is to enter judgment accordingly.

Dated: October 3, 2012.

_____/s/ James K. Singleton, Jr._____
JAMES K. SINGLETON, JR.
United States District Judge

---

[96] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[97] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.